DECISION AND JUDGMENT ENTRY
This appeal comes to us from a judgment issued by the Lucas County Court of Common Pleas, Juvenile Division, in a termination of parental rights case. Because we conclude that the trial court's decision was supported by clear and convincing evidence and appellant received effective assistance of counsel, we affirm.
Appellant, April H., is the natural mother of Alexander H., born July 20, 1999. On July 23, 1999, appellee, Lucas County Children Services ("LCCS"), filed a complaint for dependency and neglect and was granted temporary emergency custody of Alexander. On September 7, 1999, LCCS filed an amended complaint requesting permanent custody of Alexander. On October 21, 1999, the juvenile court held a hearing on the matter, at which appellant failed to appear. After hearing the evidence presented, the court granted permanent custody of Alexander to LCCS. However, the court vacated its decision after discovering that appellant had not received proper notice of the termination hearing.
The court conducted a second hearing on December 6, 1999. During adjudication, appellee presented various witnesses and evidence that appellant suffered from chronic schizophrenia, that she often denied having this condition, and that she was non-compliant with her mental health treatment. At the time of the hearing, appellant lived with her father, Thomas H., who had been appointed her legal guardian because of her mental illness. Appellant had been hospitalized prior to Alexander's birth in Northcoast Behavioral Hospital, a psychiatric facility, where she was treated for schizophrenia. After recovering from the birth of the child, appellant was placed in the psychiatric treatment program at St. Charles Hospital. She was released from that program and was to continue outpatient treatment with the Unison Behavioral Health Care Group.
At the adjudicatory hearing, Cynthia Kniolek, caseworker for LCCS, testified that the day after Alexander was born, she visited with appellant at Toledo Hospital because the agency received a referral regarding appellant's ability to care for Alexander. Appellant, then twenty-three years old, stated that although she did not know where she was going to live after she left the hospital, she was capable of caring for her baby. Kniolek also testified that appellant did not know why she had been taken to Northcoast, denied that she was schizophrenic or that she needed treatment or medication.
Mike Willeman, a social worker at Northcoast, testified appellant was admitted to the Northcoast psychiatric facility in March 1999 under a court-ordered involuntary ninety-day commitment. When first admitted, appellant was resistant to treatment, suffered from hallucinations, and denied that she was approximately five to six months pregnant. She was diagnosed as schizophrenic, paranoid type. Appellant eventually cooperated and received medications which ultimately improved her overall condition. Willeman stated that appellant continued to deny her pregnancy until the final two or three weeks prior to her discharge. According to Willeman, appellant continued to have auditory hallucinations.
On July 20, 1999, appellant was transferred to Toledo Hospital to deliver Alexander. When asked about caring for herself and the baby, appellant stated that she planned to move to Florida or Georgia. However, she could not specify with whom she planned to live or how she would take care of the baby. Between the ages of seventeen and twenty-two, appellant had been hospitalized for her mental illness approximately fourteen times in four Ohio hospitals and several out-of-state placements. At the time of admission to Northcoast, appellant had self-inflicted cigarette burns on her body, but could not explain why they were there.
Willeman stated that at the time of Alexander's birth, appellant still denied her mental illness and had limited insight into her need for continuing treatment. In Willeman's opinion, this denial made it unlikely that appellant would ever be able to care for Alexander.
Appellant, against the advice of counsel, then testified. She stated that she loved her baby and "he's a beautiful little boy and I want him back." She indicated that she did not understand why LCCS became involved with her. She also stated that she did not know why she was placed at Northcoast because she did not need to be hospitalized. She explained that the father of her baby was a man named Ramon whom she met on the beach in Florida. She related that she had lived in a variety of places, including Florida, South Carolina, Montana, and Michigan, staying with friends of her parents or her parents. She denied that she had ever lived on the streets, that she ever threatened to hit or hurt anyone, or that she abused drugs and alcohol. Appellant also denied that her body had scars from cigarette burns; she insisted that the marks were insect bites from the beach.
Based upon the testimony and medical records admitted into evidence, the juvenile court found Alexander to be a dependent child. With the parties' consent, the court then continued with disposition.
LCCS called several additional witnesses on disposition. Dr. Edward Claxton, appellant's treating psychiatrist at Unison Behavioral Health Group ("Unison"), testified that he prescribes and monitors appellant's medication. He stated that he had seen appellant approximately four times, that she appeared to cooperate with her therapy and medication, and that, to the best of his knowledge she was complying with his directives. Based upon her history of hospitalizations, he opined that her future progress was "guarded" and depended on her continuation of treatment.
Appellant's father, Thomas H., then testified that he became appellant's legal guardian because she was unable to care for herself and would not seek psychiatric treatment on her own. He stated that appellant often would leave for periods of time, traveling to various places and living on the streets. According to her father, appellant has been located in Florida, South Carolina, and other places where she made friends and lived with them. However, she then got "kicked out" because of her violent and strange behavior and lived on the street. In January 1999, he had paid for a bus ticket to return her from South Carolina where she was homeless. In another instance, he had to pick her up in Canada because she traveled there and was being held by authorities for illegal entry.
Appellant's father stated that appellant had burned herself with cigarettes, had struck him with a telephone, had threatened him, and often behaved in unsafe ways. He noted that she put an empty pan on a lighted stove burner and then forgot about it while she tried to read instructions on how to make oatmeal. He stated that appellant left the group home where she had been placed as part of her therapy to enable her to live on her own. After she left the home, she lived on the street for ten days and was eventually picked up by police. He testified that since about August 30, 1999, she has been living mainly with him.
Appellant's father then testified that he did not believe appellant was progressing in her therapy. He testified that he had found evidence in his trash that she had been drinking beer, even though she has been told not to do so with her medication. Appellant's father stated that he makes sure appellant takes her medication every day, as she does not remember to take it on her own. He also testified that during the past nine years since she was first diagnosed, she did not cooperate with the various facilities and refused treatment. Unless appellant's father reminds her of and provides transportation to her appointments with Unison, appellant misses them. Appellant's father further testified that appellant would be unable to care for Alexander and that other family members were not in a position to care for him.
The next witness, Brandi Carmen, appellant's case manager at Unison, testified regarding appellant's progress in their program during the previous three months. She stated that, in an effort to regain custody of Alexander, appellant had been working on three main goals: 1) to establish and maintain income through welfare or social security; 2) to establish and maintain stable housing; and 3) to establish some insight into her mental illness. Carmen noted that appellant's father had helped her to apply for and begin receiving SSI payments.
Carmen stated that appellant had been unsuccessful in accomplishing her other two goals. As part of her post hospital therapy, appellant was to live in a group home where she could be supervised for medications and learn life skills, such as cooking, doing laundry, cleaning, and dealing with crisis issues. However, appellant refused to cooperate and insisted that she wanted to move immediately into her own apartment.
Appellant became angry with Carmen when she would not facilitate appellant's apartment idea when they were discussing her subsidized housing application for group home placement. Carmen also testified that appellant had no insight into her mental illness. She stated that appellant only kept about one-fourth of her mental health appointments. Her attendance had improved but only because her father now brings her and Carmen takes her home; appellant never attended an appointment on her own.
Appellant's grandmother then testified and essentially corroborated that appellant has suffered from the symptoms of her mental illness since high school. The grandmother stated that appellant often left home and lived on the streets, that she had been unable to care for her own personal hygiene and that she has shown violent behavior. Appellant's grandmother testified that she would not allow appellant to stay overnight in her home.
Finally, Ann Hodge, an LCCS caseworker, testified that Alexander was in a potential adoptive placement. She stated that the agency had initially only filed for temporary custody to permit a possible reunification. This approach was taken because appellant was given a new drug during her hospitalization. However, in November 1999, the agency amended the complaint to request permanent custody after appellant was discharged from the inpatient program and failed to make any progress. Hodge noted that due to scheduling problems, appellant was given only three opportunities to have one-hour visits with her baby. However, during two of those visits, appellant left fifteen minutes early, leaving the baby with an LCCS worker. Hodge also stated that the agency had not received any contact from anyone claiming to be the father of appellant's baby.
The guardian ad litem for Alexander also recommended that LCCS be given permanent custody. Based upon the evidence presented, the court terminated appellant's parental rights and granted permanent custody to LCCS.
Appellant now appeals from that decision, setting forth the following two assignments of error:[1]
 "I. THE TRIAL COURT'S GRANT OF PERMANENT CUSTODY WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 "II. THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL."
 I.
Appellant, in her first assignment of error, argues that the trial court's decision was not supported by clear and convincing evidence.
A juvenile court may grant a motion for permanent custody of a child to a public services agency if the court finds, by clear and convincing evidence, that (1) it is in the best interest of the child to grant permanent custody to that agency and (2) the child, not abandoned or orphaned, cannot be placed with either of his parents within a reasonable time or should not be placed with his parents. R.C. 2151.414(B)(1).
To determine the best interest of the child, R.C.2151.414(D) provides, in pertinent part, that:
 "the court shall consider all relevant factors, including, but not limited to, * * *
 "(1) The interaction and interrelationship of he child with his parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through his guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child * * *;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
"* * *"
To enter a finding that the child cannot be placed with his parents within a reasonable time or should not be placed with his parents, the court need find, by clear and convincing evidence, that only one of the twelve factors enumerated in R.C.2151.414(E) exists. Two of these factors are that:
 "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353
[2151.35.3] of the Revised Code;
In this case, the record contains overwhelming evidence that appellant suffers from severe and chronic mental illness and has not been able to gain any insight into her condition. Appellant, although twenty-three years old, is under the care of a guardian, her father, who was appointed because she has been deemed incompetent to care for herself. She has been unable to follow through with treatment for her schizophrenia and is unlikely to do so in the near future. Appellant was unable to attend therapy sessions unless transported by her father or her therapist; her father makes sure that she takes her medications. By appellant's own testimony, she sees no need for medications or therapy and, if left on her own, would not seek treatment at all. While we recognize appellant's understandable desire to have her baby returned, the evidence demonstrates that, due to her chronic mental illness, appellant is simply unable to care for herself or her child. Consequently, she has also failed to remedy the conditions for which the child was removed. Therefore, we conclude that the trial court's decision to grant permanent custody of Alexander to LCCS was supported by clear and convincing evidence.
Accordingly, appellant's first assignment of error is not well-taken.
 II.
Appellant, in her second assignment of error, claims that she did not receive effective assistance of counsel.
In order to prove ineffective assistance of counsel, a defendant must show 1) that defense counsel's representation fell below an objective standard of reasonableness and 2) that counsel's deficient representation was prejudicial to defendant's case. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. See also Strickland v. Washington (1984),466 U.S. 668, 694.
In this case, appellant contends counsel should have objected to testimony of her father and grandmother because statements made by her were inadmissible. Such statements are admissions by a party opponent and are not inadmissible hearsay. See Evid.R. 801(D)(2).
Appellant also argues that the testimony of appellant's father was in conflict with his role as guardian for her. A guardian is required to act in the best interest of his ward, which may or may not be the same as the ward's wishes. See R.C.2111.13; Maylin v. Cleveland Psychiatric Institute (1988),52 Ohio App.3d 106
(guardian is to act in the best interests of the ward.) Nothing in the record indicates that Thomas H. did anything but act in appellant's best interest.
Finally appellant argues that her counsel did not advise her adequately against testifying. However, the record shows that, despite counsel's and the court's repeated advice against it, appellant insisted upon testifying.
Upon a complete review of the record, we can find no indication that appellant's counsel failed to reasonably represent appellant's interests. Therefore, appellant has not established the first criteria needed to prove an ineffective assistance of counsel claim.
Accordingly, appellant's second assignment of error is not well-taken.
The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Court costs of this appeal are assessed to appellant.
Melvin L. Resnick, J., James R. Sherck, J., Mark L. Pietrykowski,J., CONCUR.
[1] Although appellant also argues that the decision was "against the manifest weight" of the evidence, the correct standard is whether or not clear and convincing evidence was presented. R.C. 2151.414(B)(1). "Clear and convincing" is that level of evidence which is sufficient to establish in the mind of the trier of fact a "firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus. Thus, the clear and convincing standard includes the weighing of evidence.